(The Commonwealth *v.* Brown.)

did not make their motion to quash until *March* term, although they might have made it at any time between the 15th of *January*, when the appeal was filed and the 24th of that month, when the court adjourned.   An appeal from the judgment of a justice of the peace is not an analogous case, for the act of assembly giving that appeal, expressly requires it to be filed in the office of the prothonotary, on or before the first day of the next term of the court of Common Pleas, and it was upon this legislative enactment that the case of *Beale* v. *Dougherty* was decided.  The act giving the present appeal, contains no such provision.

---

[Philadelphia, January 6, 1832.]

## The COMMONWEALTH *against* BROWN.

Burglary may be committed in a house in the city, in which the prosecutor intended to reside on his return from his summer residence in the country, and to which, on going into the country, he had removed his furniture from his former residence in town ; though neither the prosecutor nor his family had ever lodged in the house, in which the crime is charged to have been committed, but merely visited it occasionally.

In an indictment for burglary, it is not necessary to charge the prisoner with having broken and entered the prosecutor's house *with an intent* to commit a felony therein.

The prisoner, *James Brown*, was found guilty of burglary, at a court of Oyer and Terminer, held by the Chief Justice and Mr. Justice Ross, on the 27th *November*, 1830.   His counsel moved for a new trial, and in arrest of judgment.

(The Commonwealth *v.* Brown.)

" 1*st.* Because the verdict was against and without sufficient evidence in this ; that the only evidence against the prisoner, of breaking and entering in the night time, was his own confession, which was obtained from him by the constable, by holding out to him the hope of impunity.

" 2*d.* Because the verdict was against law in this ; that the house of the prosecutor was not his dwelling house, nor one in which a burglary could, at the time of the alleged offence, have been committed.

" 3*d.* Because the indictment does not charge the prisoner with having broken and entered the prosecutor's house, with intent to commit a felony therein."

At the trial it appeared, that Mr. *Harvey,* the prosecutor, was an inhabitant of the city of *Philadelphia,* but that at the period at which the offence was charged to have been committed, he had retired to a temporary residence in the country, having abandoned and advertised for sale the house in which he had previously resided in the city, and intending to return to another of which he was the owner, and to which he had removed his furniture. During his sojourn in the country, the house to which he had removed his furniture, with an intention to make it his residence on his return to the city, was occasionally visited by the family, thrown open and used as a stopping place, precisely as his other town house had been used during his summer retreat, in the preceding years, except that the furniture was not arranged, or the house set in order for the permanent reception of the family. While thus situated, the house was broken and entered by the prisoner in the night time, and the goods stolen as charged in the indictment.

These motions were now argued by *Haley* and *K. Smith,* for the prisoner, and by *Wurts* for the attorney-general.

On the part of the prisoner, it was argued, that the prosecutor not having begun to inhabit the house, as the family had never lodged in it, the act of breaking into it in the night time, and carrying away the goods, did not constitute the crime of burglary. Sergeant *Hawkins,* it is true, asserts, that the removal of part of the tenant's goods to a house intended to be inhabited by him, makes it his mansion, and the subject of bulgary, but there is a *quere* affixed to the authority, which is cited in the margin, *Kelyng's Rep.* 46. And since the *American* Revolution, the point has been ruled otherwise in *Westminster Hall.* (To establish this, Mr. *Haley* offered to cite several *British* authorities, but was stopped by the court, because *British* decisions since 4th *July,* 1776, are not only declared not to be authority here, but even the citation of them is expressly forbidden by the act of 29th *March,* 1809.)

In arrest of judgment, it was argued, that the breaking and entering must be specially laid to have been with an intent to commit a felony. If there was no such intent at the time, a felonious design conceived and executed afterwards, will not constitute a burglary.

(The Commonwealth *v.* Brown.)

In an indictment, nothing is to be taken by inference or intendment. All the essential parts of the offence must be positively charged. Hence it follows, that the intent to commit a felony at the time of breaking and entering, must be stated.

(The judges who tried the prisoner, having declared, that the exception to the evidence was not founded in fact, the constable having merely *advised* the prisoner to confess, without having made any *promise* of impunity, the remaining point was not argued.)

On the part of the *Commonwealth* it was answered, that *Hawkins,* (himself a great authority) is express to the point, that a house occupied as this was, may be the subject of a burglary, and such was the law at the time of our revolution. The courts of this state would be still in a state of colonial dependence, if they were bound to follow, against the declared will of the legislature, the wanderings of the *British* judges, through all their changes of the common law, without regard to the reason or policy of those changes. The change in this particular, was forced upon them by the sanguinary punishment annexed to the offence, but the same considerations of humanity do not plead for a correspondent change here, in consequence of the mitigated punishment prescribed by our mild penal code. A great amount of property is annually exposed to depredation by the absence of the families of its owners each summer, in search of health or pleasure, and sound policy demands a strict adherence to the common law as it stood at the period of our revolution.

In answer to the argument in support of the motion in arrest of judgment, it was said, that however plausible it might be in theory, it is sufficient, that the form of the indictment is in strict accordance with all the precedents, without a single exception.

The opinion of the court was delivered by

GIBSON, C. J.—As regards the point involved in the motion for a new trial, there is little doubt of the law at the period material to the question. "It is agreed *by all,*" says Sergeant *Hawkins,* "that a house wherein a man dwells but for a *part* of the year; or a house which one has hired to live in, and brought part of his goods into it, *but has not yet lodged in,* may be called his dwelling house, and will sufficiently satisfy the words *domus mansionalis* in the indictment, whether any person were actually therein or not at the time of the offence." (*Hawk. P. C. B.* 1 *Ch.* 38. § 18.) Otherwise, where the house is under repair, though part of the owner's goods be deposited in it, for till he take possession with an *intent* to inhabit, it is not his mansion or dwelling. (*Id.* § 19.) It is certainly true, that the case referred to by Mr. *Leach,* the learned editor of *Hawkins,* is, by no means decisive, and it is also true, as remarked by Mr. *East,* (*Cr. Law,* 497,) that the point has since been frequently ruled otherwise. But even the uncorroborated opinion of Sergeant *Hawkins,* whose *Pleas of the Crown* has long been the text book of the profession, would be a safe foundation for a decision. What is there to prevent it from

(The Commonwealth *v*. Brown.)

being used as such here? Assuredly nothing but the determinations of the *British* courts since the declaration of our independence, and consequently nothing in the shape of precedent to which we are at liberty to pay respect, were we so disposed, further than it may seem entitled to it, for its intrinsic reason and good sense. Then even were we to lay *Hawkins* out of view, the case would come to us as one of the first impression. Now, without denying the solidity of the principle, on which the modern *English* cases were decided, it is sufficient to say, it is inapplicable to the case of the prisoner. In none of them was the residence of the prosecutor, actual or constructive, in the house, which was the subject of the alleged offence, as it does not appear, that he had abandoned his previous residence elsewhere. Now I readily grant that the law does not extend the privilege of the castle to more than one dwelling in the same place; consequently till the old dwelling be broken up, a new one cannot be acquired. What was the case here? In retiring to the country during the hot months, the prosecutor was not the less an inhabitant of *Philadelphia*, which undoubtedly continued to be the place of his domicil. He had permanently discontinued his residence in the house previously occupied by him; and unless the house to which he intended to return, and which was in the mean time used as his town house, be taken to be the place of his permanent residence, he must be considered as presenting the strange spectacle of an inhabitant without a habitation. As his domicil, it subjected him to the duties, and entitled him to the privileges and immunities of a citizen, in reference to the ward in which it was situate, determining in this respect the place of exercising his right of suffrage, or of receiving notice, or a tender, or of transacting any matter or thing which might involve the question of residence. It was therefore his habitation, and his castle even in the absence of the family. Is lodging in the house *evidence* of habitation, or a constituent part of it? If it be the former, its place may be supplied by any other evidence equally satisfactory; and if it be the latter, it will be difficult to sustain those convictions that have frequently taken, place notwithstanding the temporary absence of the inmates at the time of the offence, as the quality of residence being rendered incomplete by the actual discontinuance of one of its essential parts, would cease as soon as the family had withdrawn. The propriety of those convictions, however, has never been questioned by any man, who made pretension to the character of a lawyer. Originally, no doubt, the principal ground of the offence was the invasion of the family retreat, when the inmates were in a state of repose, and consequently comparatively defenceless; but it is not the only one; else it would follow, that a house actually uninhabited, would be stript of its peculiar sanctity by the accidental absence of the family; which, every sciolist knows, is not the law. As an authority for this, Sir *John Nutbrown's Case*, (*Foster*, 76,) is in point; and the principle is asserted in many other cases. Convictions of burglary, when the family were out of town, and when no person lodged in the house, have been of every day occurrence in

the courts of Oyer and Terminer here. Why then shall the house of the prosecutor here be less under the protection of the law than if the family had lodged a night in it previous to setting out on their summer excursion? Many inhabitants of our seaport towns shut up their houses as regularly as the summer comes; and thus leave a considerable mass of property peculiarly exposed to depredation, from which it surely cannot be sound policy to withdraw the protection of the law, when it is most needed. At the declaration of our independence, the law would undoubtedly have been held here, as it is laid down by Sergeant *Hawkins;* and it seems to me, we ought not to follow the *British* judges in changing it for reasons of humanity, which have no place here; especially as their decisions are forbidden by the legislature to be followed as precedents, and when were it otherwise, we would be equally bound to follow them where they would bear hard on the prisoner, as they not unfrequently would.

The motion in arrest of judgment is founded on the absence of a direct averment, that the breaking and entering was with a felonious intent; and although a larceny is charged to have been committed afterwards, it is argued with much theoretical plausibility, that this may have been in pursuance of a design subsequently hatched. It is certain, that all material facts must be positively charged instead of being collected by inference; but in this particular the indictment is found to be in strict accordance with the most approved precedents, (*Cro. Cir. Comp.* 203,) and, for that reason, this motion, also, must be overruled.

The prisoner was sentenced to five years solitary confinement in the Eastern Penitentiary.